Filed 6/5/13  P. v. Griffin CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055126 |
| v. | (Super.Ct.No. RIF112804) |
| RAYMOND GRIFFIN, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michael D. Wellington, Judge.  (Retired judge of the San Diego Super. Ct., assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed in part and reversed in part.

Patricia Ihara, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and A. Natasha Cortina and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

1

Pruitt, Chapman, and Newell: The three witnesses who implicated defendant Raymond Griffin in a double murder. All three were crackheads; all three had prior felony convictions.

Robert Pruitt testified that he saw defendant shoot one of the two victims in the head; while fleeing, Pruitt heard more shots.

Sheila Chapman testified that she saw defendant driving toward the site of the shooting. Chapman resembled one of the victims; defendant made a U-turn to take a closer look at her before driving on. Minutes later, she heard shots.

Michael Newell told police that defendant had admitted to him that he shot the victims. A few months later, defendant beat Newell with a brick, "for snitching."

A strong case, one would think. And, indeed, a jury found defendant guilty on two counts of first degree murder (Pen. Code, §§ 187, subd. (a), 189), as well as unlawful possession of a firearm (Pen. Code, § 12021, subd. (a)(1)), unlawful possession of ammunition (Pen. Code, § 12316, subd. (b)(1)), and threatening a witness (Pen. Code, § 140), with various enhancements.

When defendant filed a motion for new trial, however, it became clear that his trial counsel had rendered ineffective assistance in numerous respects. First, with regard to Pruitt, trial counsel failed to bring out the fact that Pruitt had testified pursuant to a plea bargain. Under that bargain, if Pruitt testified (in accordance with his testimony at the preliminary hearing) that defendant was the shooter, his sentence on other charges would be reduced from 25 years to life to just 10 years. Trial counsel also failed to bring out

2

numerous inconsistencies between Pruitt's testimony at the preliminary hearing and his testimony at trial. In addition, trial counsel failed to bring out the fact that Pruitt saw the crime scene after the shooting. Thus, the prosecutor was able to argue misleadingly that Pruitt had no reason to lie; that Pruitt's testimony had never changed; and that Pruitt's testimony was corroborated by physical evidence at the scene.

Second, with regard to Chapman, trial counsel failed to bring out the fact that Chapman was Pruitt's girlfriend. He also failed to bring out inconsistencies between Pruitt's statements to Chapman and Pruitt's testimony at trial. As a result, the prosecutor was able to argue misleadingly that Pruitt and Chapman corroborated each other and that they had had no opportunity to coordinate their stories.

Third, with regard to Newell, trial counsel failed to introduce evidence that Newell had eventually admitted that his statement that defendant had admitted the shooting was false. He also failed to introduce evidence that defendant beat Newell, not for snitching on defendant, but for snitching on defendant's brother.

And this is not all. The trial court found additional instances of ineffective assistance. Nevertheless, it found that the ineffective assistance was not prejudicial.

Reviewing this prejudice finding independently, as we are required to do, we conclude that it was erroneous. Trial counsel's ineffective assistance — which gave all three of the key witnesses against defendant a false aura of veracity — undermines our confidence in the outcome.

I

FACTUAL BACKGROUND[1]

A.   *The Discovery of the Shooting*.

On February 28, 2003, at 1:34 a.m., the police went to University and Douglass Avenues in Riverside in response to several "shots fired" calls.  In a parking lot, next to the Economy Inn, they found the bodies of Tanya Morris and Darrin Hutchinson.  Each victim had been shot in the head, twice, at close range.  At least three of the bullets had been fired from the same gun; the fourth was too damaged to permit comparison. Hutchinson was holding a plastic bag, and there were beer cans nearby.

B.   *The Testimony of Sheila Chapman*.

Witness Sheila Chapman had prior convictions for burglary, selling drugs, and unlawful possession of ammunition and four prior convictions for theft.

At the time of the shooting, Chapman was living at the Economy Inn.  She was using crack cocaine; "[s]ometimes" she worked as a prostitute.  She was a close friend of victim Morris and of Morris's family.  She had been told that she resembled Morris from behind.

On February 28, 2003, around 1:30 a.m., Chapman was walking west on University Avenue.  She noticed a red car, like a Honda Civic,[2] going east, toward the

---

[1]   The following statement of facts is taken from our opinion in defendant's prior appeal.  (See Part II.B, *post*.)  Both sides have used it in their briefs and thus have virtually stipulated that it is adequate.

[2]   Defendant had a red or burgundy Acura.

Economy Inn. The driver looked at her. He then made a U-turn and drove past her slowly. She saw his face. He was wearing a gray sweatshirt, with a hood. He turned around again and pulled up next to her. They looked at each other again. He then drove away, toward the Economy Inn.

Two or three minutes later, she heard four shots. In court, Chapman identified defendant as the driver she had seen.

C.      *Michael Newell's Statement to Police*.

On or about March 18, 2003, witness Michael Newell was arrested on an unrelated drug possession charge. The police questioned him about the shooting. He told them, "[I]f I'm in custody, I ain't got nothin' to say . . . ." They responded that, if he had "something good that we can use, . . . we will contact the District Attorney's office about your pending case . . . ."

Newell then said that "Big Wack" had killed the victims. He identified defendant as "Big Wack." He explained that he had been visiting defendant's brother when defendant showed up. Defendant said that, although the police no longer suspected him, he was "the one [who] shot the muthafuckers . . . ." One of the victims had "jacked" him, "and the other one knew about it . . . ." Defendant mentioned that one of the victims was from Compton[3] and that he was warring with Blacks from Compton (using the "N" word).

---

[3]      Victim Darrin Hutchinson lived in Compton.

5

Newell claimed that he was glad to talk to detectives because he wanted to "turn[] State[']s evidence," and the "uniform cops, they couldn't do shit for me . . . ."

According to a gang expert, both defendant and Newell were members of the Main Street Crips. On March 21, 2003, the police searched 1815 Seventh Street and 3511 Chicago Avenue; each location was within blocks of the crime scene. The searches revealed that these were crack houses operated by defendant. There was also expert testimony that if there was even a rumor that someone had stolen drugs or money from defendant, it would be "almost his job" to kill that person.

D. *The Testimony of Robert Pruitt*.

Witness Robert Pruitt had two prior convictions for robbery and one for drug possession. In addition, he was serving a "three strikes" sentence for aiding and abetting the sale of cocaine.

At the time of the shooting, Pruitt was living at the Economy Inn and using crack cocaine. On the night of February 27-28, 2003, he was sitting out on the front stairs of the motel. His girlfriend, Sandra Mata, was with him. Around 1:00 or 2:00 a.m., he saw a group of five people — three men and two women. One of the women was victim Tanya Morris. Pruitt knew Morris and greeted her. One of the men was victim Darrin Hutchinson; at the time, however, Pruitt did not know Hutchinson. Hutchinson was carrying some beer in a plastic bag.

6

The group walked past Pruitt, then went around the side of the motel, into the parking lot. Moments later, Pruitt saw defendant walking the way the group had gone. Defendant was wearing a black hooded sweatshirt, with the hood over his head.

Pruitt knew defendant as "Wack" or "Big Wack." They had first met some 15 years earlier, when they were both living in Los Angeles. Defendant had been a member of the Main Street Crips; Pruitt had been a member of the rival East Coast gang.

Pruitt said, "What's going on, Wack?" Defendant said, "Nothing," but added, "I'll talk to you later. I have something . . . to do, something to take care of right quick." Suddenly, Pruitt remembered a rumor that Morris "had been involved in a robbery of one of the defendant's drug spots[.]" He went and peeked around the corner of the motel.

Pruitt saw defendant with the other five people. Defendant seemed to be "exchanging some words" with Hutchinson. Pruitt then saw defendant take out a gun, point it at Hutchinson's head, and fire. Pruitt turned and went up to a motel room. As he went, he heard three or four more shots. Once inside, he looked out a window and saw two bodies.

Some weeks after the killing, the police interviewed Pruitt. He told them that he saw Morris, then saw defendant, and then heard shots. He did not tell them that he actually saw defendant shooting, because he was scared and "didn't want to get involved."

7

E.      *The Beating of Newell.*

On July 4, 2003, around 2:00 a.m., the police found Newell lying on the ground and screaming.  He was on the property directly behind defendant's crack house at 1815 Seventh Street.  He had several broken fingers, several broken ribs, and a broken lower right leg.  His right ankle was broken and "pointing a different direction than normal."

Newell told police that he had gone to 1815 Seventh Street to visit a friend, but when he got there, he found defendant, defendant's nephew, and defendant's mother waiting for him.  Defendant said "This is for snitching," and indicated that he was going to shoot Newell.  Newell ran away through the back yard, but when he tried to hop the back yard fence, defendant grabbed his foot.  Defendant and the other two people then beat him with bricks.

F.      *Newell's Testimony.*

At the time of trial, Newell was in custody for receiving stolen property.  He testified that he used to be a Main Street Crip.  He admitted having known defendant "[p]ractically all our lives."

Newell claimed not to remember any statements that he had made to police.  He did admit that his 2003 drug possession "case was dropped, and [he] got out[.]"  He also admitted that he had been "assaulted pretty badly" and hospitalized.

G.      *The Testimony of Defendant.*

Defendant testified in his own behalf. He admitted prior convictions for unlawful possession of a firearm, the grossly negligent discharge of a firearm, and possession of

8

cocaine for sale. He admitted that he had once been a member of the Main Street Crips. His moniker had been "Wacky," "Wack" or "Big Wack." He testified, however, that he left the gang in 1989, because he did not want to have to kill anybody. In retaliation, some friends of his shot him in the back and beat him. As a result of this (plus a bout of cancer), he wore leg braces and walked with a limp.

"[D]ue to my disability," defendant testified, "my only . . . means of survival was to sell narcotics." He admitted selling drugs at the Seventh Street and Chicago Avenue locations. However, he denied that anyone had ever robbed his drug operations.

Defendant testified that, on the night of February 27-28, 2003, he was in Orange County, visiting some "young ladies" he had met a week earlier. He went with one Alex Camarena, who lived at the Seventh Street crack house. They left Riverside around 4:30 or 5:00 p.m. On the way, they met up with Alex's girlfriend, Gracie. When they got back to Riverside, between 1:30 and 2:00 a.m., they saw the police already at the crime scene.

Defendant could not remember any of the girls' names. He did not know to what city in Orange County he went. On the way there, Alex drove. Defendant drove back but did not remember the route; Alex was giving him directions.

Defendant denied killing the victims. He did not know Hutchinson. He knew Morris "[t]hrough the neighborhood," and he considered her a friend. He was "upset and hurt" when she was killed. He even obtained some information about the murders, which

9

he passed along to her sister.  When he learned that he was wanted for homicide, he turned himself in.

Defendant admitted having an "altercation" with Newell, not because Newell was a snitch, but because defendant found Newell outside his Seventh Street crack house, taking money from his customers.  He told Newell to leave, but Newell threw a punch at him.  "[M]utual combat" ensued.  After Newell hit defendant with a brick, defendant took it away and started hitting Newell with it.  When Newell kicked him, he twisted Newell's leg.

H.     *The Testimony of Alex Camarena.*

When Alex Camarena testified, he was in custody for a domestic violence offense. He had two prior convictions for selling drugs.  He largely corroborated defendant's alibi.  However, he testified that they left Riverside between 5:00 and 6:00 p.m., and they went to Santa Ana.  He claimed to be unable to remember Gracie's last name, even though he had gone out with her for almost a year.  He and defendant left Orange County around 2:45 a.m.  He guided defendant onto the freeway, then went to sleep.

I.     *Rebuttal Evidence.*

On March 21, 2003, the police first interviewed both defendant and Camarena. Neither of them said that they had been in Orange County on the night of the killing.  To the contrary, defendant said that he believed that he had been at the Seventh Street address.

II

PROCEDURAL BACKGROUND

A.  *Defendant's Conviction.*

In November 2007, after a jury trial, defendant was found guilty as follows:

Counts 1 and 2:  First degree murder (Pen. Code, § 187, subd. (a)), with gang and multiple-murder special circumstances (Pen. Code, § 190.2, subds. (a)(3), (a)(22)) and with firearm enhancements (Pen. Code, § 12022.53, subd. (d)).

Count 3:  Unlawful possession of a firearm (Pen. Code, § 12021, subd. (a)(1)).

Count 4:  Unlawful possession of ammunition (Pen. Code, § 12316, subd. (b)(1)).

Count 5:  Threatening a witness (Pen. Code, § 140), with an enhancement for personally inflicting great bodily injury (Pen. Code, § 12022.7, subd. (a)).

Defendant admitted three 1-year prior prison term enhancements.  (Pen. Code, § 667.5, subd. (b).)  Accordingly, in April 2008, he was sentenced to 10 years 8 months in prison, plus two consecutive terms of 25 years to life, plus two consecutive terms of life without the possibility of parole.

B.  *Defendant's First Appeal.*

Defendant appealed.  In January 2010, we filed our opinion.  (*People v. Griffin* (E045561, Jan. 27, 2010) [nonpub. opn] (*Griffin I*).)  In it, we noted that Pruitt had received a plea deal that required him to testify truthfully at defendant's trial.  In return, Pruitt's sentence on unrelated charges would be reduced from 25 years to life to just 10 years.  (*Griffin I,* at p. 13.)

The plea deal further provided that whether Pruitt had testified truthfully would be determined by comparing his testimony at defendant's trial to his testimony at defendant's preliminary hearing. As Pruitt's trial court put it: "He nailed himself down in terms of his testimony in the preliminary[ ]hearing transcript. If he testifies at the trial that . . . 'My memory's got cloudy, and I don't really remember any kind of shooting,' then he may find himself back in the world of twenty-five years to life. [¶] If there's some little tiny detail that maybe he remembers differently now that several years ha[ve] passed, I'm forgiving in that regard . . . . Because witnesses are human. They're not computers. If it's anything in between, I'll do my best to decide the in between."

We held that defendant's trial counsel (Christopher Dombrowski) had rendered ineffective assistance by failing to bring out the fact that Pruitt was testifying pursuant to a plea deal. (*Griffin I,* at pp. 22-23.) However, we also held that the ineffective assistance was not prejudicial, for four reasons:

1. Pruitt's testimony that he saw the shooting was corroborated by the fact that he knew details of the shooting scene. (*Griffin I,* at p. 24.)

2. Chapman and Newell corroborated Pruitt's testimony. (*Griffin I,* at p. 24.)

3. Pruitt's plea deal was "only mildly" impeaching, particularly as it required him to testify truthfully. (*Griffin I,* at p. 25.)

4. Defendant's alibi testimony was "strikingly unconvincing." (*Griffin I,* at p. 25.)

We also held that the prosecutor had committed misconduct by stating falsely, in closing argument, that Pruitt did not have a plea deal.[4] Defendant's trial counsel, however, forfeited the misconduct by failing to object. (*Griffin I,* at pp. 15-19.)

Likewise, the prosecutor (Brandon Smith) had committed misconduct by stating in closing argument that there was "no connection" between Pruitt and Chapman. Actually, he knew from the preliminary hearing testimony that Pruitt and Chapman were boyfriend and girlfriend. Again, however, defendant's trial counsel forfeited the misconduct by failing to object. (*Griffin I,* at pp. 26-28.)

Finally, we held that the trial court had erred by denying defendant's posttrial *Marsden* motion.[5] (*Griffin I,* at pp. 37-44.) We concluded: "[W]e have already determined that defense counsel's performance was objectively unreasonable in at least one instance. Admittedly, we have also determined that that instance was not prejudicial. Nevertheless, to prevail on a *Marsden* motion, the defendant need only show incompetent representation, not prejudice. [Citations.] It follows that, on remand, the trial court would be required, as a matter of law of the case, to grant the *Marsden* motion.

"It does not equally follow that the trial court would be required to grant a motion for new trial based on ineffective assistance. Indeed, in that situation, law of the case

---

[4]      The People conceded that the prosecutor had committed misconduct. (*Griffin I,* at p. 17, fn. 4.)

[5]      A "*Marsden* motion" is a motion to discharge existing appointed counsel, based on ineffective assistance, and to appoint new counsel. (*People v. Marsden* (1970) 2 Cal.3d 118.)

13

would work the other way — as long as the only asserted instance of ineffective assistance is the failure to impeach Pruitt, the trial court will be required to deny the motion, because we have held that that . . . instance was not prejudicial. New counsel, however, may discover and decide to assert other instances of ineffective assistance. . . .

"Accordingly, we will reverse conditionally, with directions to appoint new counsel and to set the matter for resentencing. However, unless a motion for new trial is made and granted, or other good cause is shown, the trial court shall reinstate the judgment." (*Griffin I,* at pp. 43-44.)

C.      *Proceedings on Remand.*

On remand, the case was assigned to the same judge who had presided over the trial. The trial court duly appointed new counsel, who filed a motion for new trial based on ineffective assistance of trial counsel.[6] The motion asserted the following instances of ineffective assistance:

1.      Regarding Pruitt:

a.      Failing to introduce evidence of:

i.      Pruitt's plea deal.

ii.      Inconsistencies between Pruitt's trial testimony and his preliminary hearing testimony.

---

[6]      Earlier, defendant had filed a motion for new trial while in propria persona. However, this motion had not yet been heard by the time new counsel was appointed. In fact, in the end, it was never heard at all. Thus, it did not bar a second new trial motion. (See *People v. Taylor* (1993) 19 Cal.App.4th 836, 839-840.)

14

b. Failing to object to the prosecutor's false statement in closing argument that Pruitt was not getting any benefit from testifying.

2. Regarding Chapman:

a. Failing to introduce evidence of:

i. Chapman's preliminary hearing testimony that she and Pruitt had discussed the shooting.

ii. Chapman's relationship with Pruitt.

b. Failing to object to the prosecutor's false statement in closing argument that there was no connection between Pruitt and Chapman.

3. Regarding Newell: Failing to introduce evidence of Newell's admission to a defense investigator that his statement to the police had been coerced and false.

4. Regarding defendant's alibi and alibi witness (Camarena):

a. Failing to introduce evidence that, in October 2003, defendant told the police about his alibi.

b. Failing to object to the prosecutor's false statement in closing argument that defendant never told the police about his alibi.

c. Failing to introduce evidence that, in October 2003, Camarena told the police about defendant's alibi.

d. Entering into a stipulation misleadingly suggesting that Camarena never told the police about defendant's alibi.

15

e. Entering into a stipulation falsely stating that, in October 2003, Camarena did not give the police the names of witnesses who could corroborate defendant's alibi.

f. Failing to object to the prosecutor's false statement in closing argument that Camarena did not give the police the names of witnesses who could corroborate defendant's alibi.

g. Entering into a stipulation misleadingly stating that defendant had denied knowing Pruitt and Newell.

h. Failing to object to CALCRIM No. 207 (Proof Need Not Show Actual Date).

The prosecution filed a written opposition.

The trial court held an evidentiary hearing at which trial counsel and defendant, among others, testified.

Trial counsel insisted that he had had tactical reasons for each of his challenged actions. However, he testified that he had very little recollection of the case;[7] hence, he did not recall what any of his tactical reasons actually were.

The trial court found that trial counsel was not credible: " . . . I don't think he was straightforward with us on the stand here. It's hard to believe that he has absolutely no

---

[7] This despite the fact that, just six months earlier, he had filed a declaration under penalty of perjury stating, " . . . I remember this case very well."

16

memory of these events. I'm struck by what appeared to me [to] be a cavalier attitude towards the proceeding, and I'm saddened by that."

The trial court also found that trial counsel had, in fact, rendered ineffective assistance in every claimed respect. However, it also found that the ineffective assistance was not prejudicial. It concluded: "I'm troubled by the quality of the representation that Mr. Griffin got. But . . . I am not left with any conviction that the result could have been any different[]. And so the motion for new trial is denied."

Defendant filed a timely notice of appeal. Thereafter, he also filed a petition for writ of habeas corpus (case No. E056255), in which he alleges that evidence outside the appellate record shows that trial counsel rendered ineffective assistance in several additional ways. We ordered the writ petition considered with the appeal for the purpose of determining whether an order to show cause should issue. The two proceedings, however, have not been consolidated. We will rule on the petition by separate order.

III

TRIAL COUNSEL'S INEFFECTIVE ASSISTANCE WAS PREJUDICIAL

The trial court found that trial counsel rendered ineffective assistance in multiple respects; the People do not argue otherwise. Defendant's sole appellate contention is that the trial court erred by finding that the ineffective assistance was not prejudicial.

A. *Standard of Review*.

"[I]neffective assistance of counsel is not among the nine grounds for ordering a new trial set forth in Penal Code section 1181, but our Supreme Court has made clear that

17

'the statute should not be read to limit the constitutional duty of trial courts to ensure that defendants be accorded due process of law,' and that in appropriate circumstances 'the issue of counsel's effectiveness [may be presented] to the trial court as the basis of a motion for new trial.' [Citation.]" (*In re Edward S*. (2009) 173 Cal.App.4th 387, 398, fn. 3.)

"The standard for establishing ineffective assistance of counsel is well settled. A defendant must demonstrate that: (1) his attorney's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant. [Citation.] A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Stanley* (2006) 39 Cal.4th 913, 954.)

On appeal, a "two-step process is appropriate" (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724):

"In the first step, the trial court [will have found] the relevant facts . . . . On appeal, all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences. The trial court's factual findings, express or implied, will be upheld if they are supported by substantial evidence. [Citation.]

"In the second step of the process, the trial court will have decided whether, on the facts which it has found, the defendant was deprived of his right to adequate assistance of

18

counsel . . . .  [¶]  To the extent that th[is is a] question[] of law, the appellate court is not bound by the substantial evidence rule, but has '"the ultimate responsibility . . . to measure the facts, as found by the trier, against the constitutional standard . . . ." [Citation.]  On that issue, in short, the appellate court exercises its independent judgment.'  [Citations.]"  (*People v. Taylor*, *supra*, 162 Cal.App.3d at pp. 724-725; cf. *People v. Tafoya* (2007) 42 Cal.4th 147, 192 [on appeal from denial of motion for new trial based on jury misconduct, "whether jury misconduct was prejudicial presents a mixed question of law and fact '"subject to an appellate court's independent determination."'  [Citation.]"].)

B.      *Failure to Consider Cumulative Prejudice*.

Preliminarily, defendant claims that the trial court failed to consider cumulative prejudice.  We disagree.  It did comment, " . . . I think . . . the best way to do it is look at these issues one at a time."  However, this was correct.  It is impossible to consider cumulative prejudice without first looking at each instance of ineffective assistance and specifying exactly how it tended to be (or not to be) prejudicial.  Indeed, that is precisely how defendant's appellate counsel has organized the opening brief.  Eventually, the trial court concluded, "[A]s I go through the *items*, the *places* where the evidence was affected by counsel's *mistakes* and what the consequences of that were, I am not left with any conviction that the result could have been any different[]."  (Italics added.)  Thus, it did consider cumulative prejudice.

19

In any event, even if the trial court did fail to consider cumulative prejudice, the error would be harmless in light of this appeal, because we review prejudice independently.  (See *Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1146 ["[i]f independent review establishes the validity of the judgment, then the error is harmless"].)

We therefore proceed to analyze the prejudicial nature of each instance of ineffective assistance.

C.      *Pruitt*.

In our previous opinion, we held that trial counsel's failure to use Pruitt's plea deal to impeach him constituted ineffective assistance but that the ineffective assistance was not prejudicial.  (*Griffin I,* at pp. 22-26.)  We also noted that, on remand, this would be law of the case.  (*Griffin I,* at p. 43.)

The trial court therefore observed:  "[T]he Court of Appeal . . . [has] already made a call as to part of this, but they made it on the basis of a set of facts that are in some ways different than what we have now.  We've had some significant additional information."  "[S]ome of the pieces that the Court of Appeal relied on really aren't now supported quite as strongly by the evidence before me here."

Nevertheless, it concluded that the failure to introduce evidence of Pruitt's plea deal was not prejudicial, because:

1.      As we had held, " . . . Pruitt knew details showing that he had seen the shooting. . . ."

20

2. Contrary to our holding, "[t]he corroboration of Pruitt by Chapman has clearly been undercut . . . . But the corroboration by Newell I think stands."

3. As we had held, "the impeachment of Pruitt [was] relatively mild . . . ."

4. As we had held, defendant's alibi was unconvincing: "I think it's significant that the defendant told the cops shortly afterwards . . . that he was at 7th Street."

We agree with the trial court that significant new facts appeared on remand. "When a record is changed in any substantial respect the law of the case doctrine does not apply. [Citation.]" (*Nollan v. California Coastal Com.* (1986) 177 Cal.App.3d 719, 724-725, revd. on unrelated grounds in *Nollan v. California Coastal Com.* (1987) 483 U.S. 825 [107 S.Ct. 3141, 97 L.Ed.2d 677].) Unlike the trial court, however, we conclude that the record as a whole, including these new facts, shows prejudice, for three reasons. First, it became apparent on remand that defense counsel also rendered ineffective assistance by failing to use Pruitt's preliminary hearing testimony to impeach him. Second, whether the failure to introduce evidence of Pruitt's plea deal was prejudicial was a close call, at best; our conclusion in our previous opinion that it was not prejudicial has been undermined by new information. Third, on remand, it also became apparent that trial counsel rendered ineffective assistance by failing to object to the prosecutor's false argument that Pruitt was not getting any benefit from testifying.

21

1.      *Additional failures to impeach Pruitt.*

Defense counsel's failure to cross-examine Pruitt regarding his plea deal was not the only flaw in his cross-examination. At the preliminary hearing, Pruitt's crossexamination took up approximately 48 transcript pages. Nevertheless, trial counsel's cross-examination of Pruitt took up only two transcript pages.

In principle, a short cross-examination can be as effective as a long one, if not more so. Here, however, trial counsel passed up the opportunity to bring out multiple contradictions between Pruitt's preliminary hearing testimony and his testimony at trial:

1.      At trial, Pruitt testified that he had been a substance abuse counselor at the Chino prison for four and a half years. At the preliminary hearing, however, he testified that he held this job from sometime in 1999 until January 2002 — i.e., three years or less.[8]

2.      At trial, Pruitt testified that, at the time of the shooting, he was living at the Econo Lodge Motel (also referred to in the record as the Economy Inn). At the preliminary hearing, however, he testified that he was living in an abandoned house.

3.      At trial, Pruitt testified that, when he talked to Morris, he was sitting on the motel steps. At the preliminary hearing, however, he testified that he was sitting on a planter.

---

[8]      Defendant claims that Pruitt's preliminary hearing testimony was "inconsistent" as to whether he left the job in October 2001 or January 2002. Actually, he testified that he went out on "stress leave" in October 2001, but he remained employed until January 2002.

22

4. At trial, Pruitt testified that the victims were accompanied by one female ("Pumpkin") and two males he did not know. At the preliminary hearing, however, he testified that they were accompanied by Pumpkin and just one male.

5. At trial, crime scene photographs showed that victim Hutchinson was wearing a dark blue sweater with white stripes and blue jeans. At the preliminary hearing, however, Pruitt testified that Hutchinson was wearing a "sweat suit type outfit" featuring "[l]oud colors" and a design "[s]omething like an African flag, sort of like checkers and octagons . . . ."

6. At trial, Pruitt testified that Hutchinson was carrying beer in a plastic bag. At the preliminary hearing, however, he testified that Hutchinson was carrying "a little brown bag, . . . like he bought something from the store, some alcohol or something."

7. At trial, Pruitt testified that, when he looked at the parking lot, he saw the other male (or males) standing a couple of feet off to the side. At the preliminary hearing, however, he testified that he could not see the other males (or male) at all.[9]

8. At trial, Pruitt testified that, after the shooting, he went upstairs to a motel room, looked out a window, and saw the bodies. At the preliminary hearing, however, he denied looking out a window while upstairs.

---

[9] Defendant asserts that there are other inconsistencies between Pruitt's testimony at the preliminary hearing and at trial about where the people he saw were standing and what they were doing. Except as noted, however, we find no such inconsistencies. To take just one example, at trial, Pruitt testified it "look[ed]" as if defendant was having a conversation with Hutchinson. At the preliminary hearing, he testified that he did not "hear" any conversation. Both statements could be true.

9.     At trial, Pruitt testified that, after the shooting, he did not look at the victims or at the shooting scene:

"Q. . . . And did you go walk up to [the victims] later on and see —

"A. No.

"Q. — where they were shot?

"A. No.

"Q. . . . And . . . I've never shown you photographs of the dead bodies?

"A. No.

"Q. I never showed you where the injuries are?

"A. No.

"Q. So the only way you know is by what you saw that night?

"A. Yes."

At the preliminary hearing, however, he testified that, a few minutes after the shooting, he went back to the scene and saw the victims "laying on the ground."

In closing argument, the prosecutor stated, "What [Pruitt] told you . . . was the same thing he told the judge during the preliminary hearing . . . . What Robert Pruitt saw that night has never changed."

We recognize that "[p]eople sometimes honestly forget things or make mistakes about what they remember." (CALCRIM No. 226.) Moreover, the preliminary hearing was in early 2004, whereas the trial was in late 2007. Still, for a man who claimed that his memory was "crystal clear," there were an awful lot of discrepancies between Pruitt's

testimony on the two different occasions. If he had been cross-examined about them —

and particularly if he had also been cross-examined about his plea deal — it seems

reasonably likely that a jury would have concluded that his testimony was unreliable.

Certainly the prosecutor would not have been able to argue, as he did, that Pruitt's

statements had "never changed."

2. *The reasoning in our previous opinion*.

a. *Pruitt's knowledge of details*.

In our previous opinion, we reasoned that Pruitt's claim that he saw the shooting

was supported by his knowledge of physical evidence at the shooting scene: (a) he

testified that Hutchinson was carrying beer in a plastic bag, and the police found beer

cans and a plastic bag at the scene; and (b) he testified that defendant shot Hutchinson in

the head, and Hutchinson was, in fact, shot in the head. (*Griffin I,* at p. 24.)

This was the state of the record, however, only because defense counsel failed to

use Pruitt's testimony at the preliminary hearing to contradict him. As already noted (see

part III.C.1, *ante*), at the preliminary hearing, Pruitt testified that Hutchinson was

carrying "a little brown bag" containing "some alcohol or something." He also testified

that, after the shooting, he went back to the scene and saw the victims "laying on the

ground." Thus, he could have seen the details to which he later testified without having

actually seen the shooting. None of this came out at trial.

As a result of trial counsel's failure to cross-examine Pruitt on these points, the

prosecutor was able to argue, in closing, that Pruitt's knowledge of details of the crime

25

scene made him credible: "Mr. Pruitt, he talked about the man he saw, the man with the bag with the beer in it. Just like the pictures. He had never seen the pictures. He didn't know how the investigation went. He just told you what he saw. There can be no question that he was there that night."

Finally, at the preliminary hearing, Pruitt admitted that, when the shooting occurred, he had been up for about three days straight, using crack cocaine. At trial, trial counsel attempted to cross-examine Pruitt on this point but did not do so effectively. He merely asked:

"Q. . . . And you'd used [cocaine] about 30 minutes before these shootings?

"A. Yes.

"Q. When — before that, when was the last time you used?

"A. Um, about [an] hour[-]and-a-half prior to that.

"Q. Okay. So you had been high a good long time?

"A. Yes."

Thus, trial counsel actually gave the misleading impression that Pruitt had been high for about two hours, not three days straight. Even though Pruitt maintained that cocaine did not affect his memory, the jury might well have questioned how well he was able to function after three days without sleep.

In sum, then, if trial counsel had cross-examined Pruitt regarding his preliminary hearing testimony, his incriminating trial testimony would have been significantly less convincing.

26

b.    *Corroboration of Pruitt by other witnesses.*

In our previous opinion, we also reasoned that Pruitt's testimony was corroborated by Chapman and Newell. On remand, however, as we will discuss in part III.D and III.E, *post*, defendant showed that trial counsel was also ineffective in failing to impeach Chapman and Newell. Thus, the fact that Pruitt, Chapman, and Newell all corroborated each other actually tends to show that trial counsel's failure to impeach each of them was cumulatively prejudicial.

c.    *The strength of the impeaching evidence.*

In our previous opinion, we reasoned that Pruitt's plea deal was only "mildly" impeaching, because it required him to testify truthfully; thus, a jury might have viewed it as actually enhancing his credibility. (*Griffin I,* at p. 25.)

Effective defense counsel, however, would have brought out precisely what "truthfully" meant (or did not mean) under the circumstances. The judge in Pruitt's case had indicated that the benchmark of truthfulness would be Pruitt's testimony at defendant's preliminary hearing: "He nailed himself down in terms of his testimony in the preliminary[ ]hearing transcript. If he testifies at the trial that . . . 'My memory's got cloudy, and I don't really remember any kind of shooting,' then he may find himself back in the world of twenty-five years to life. [¶] If there's some little tiny detail that maybe he remembers differently now that several years ha[ve] passed, I'm forgiving in that regard . . . . Because witnesses are human. They're not computers. If it's anything in between, I'll do my best to decide the in between."

27

When the police first interviewed Pruitt, he did not tell them that he saw the shooting. It was not until the preliminary hearing, when he was facing charges that carried a sentence of 25 years to life, that he first said that he saw defendant shoot the victims. It was conceivable that he lied at the preliminary hearing, because he was at least hoping for some kind of favorable treatment. In that event, the plea deal effectively required Pruitt to continue to lie.

Finally, in closing argument, the prosecutor stated that Pruitt had not gotten any kind of deal for his testimony: "Is there any reason to lie for Robert Pruitt? Any whatsoever? He doesn't get anything from this, from testifying . . . . No offers from my office. He's sitting in a jail cell right now, the same as he was before. He didn't get one thing from this . . . . [H]e didn't get one thing from pointing the finger at this man." In our previous opinion, we held that this was prosecutorial misconduct but that trial counsel forfeited it by failing to object. (*Griffin I,* at pp. 16-19.)

We did not consider whether the failure to object constituted ineffective assistance. On remand, however, defendant argued that it was indeed ineffective assistance, and the trial court agreed. This additional instance of ineffective assistance compounded and reinforced trial counsel's initial failure to impeach Pruitt. Thus, it changes the prejudice analysis.

In sum, if trial counsel had introduced evidence of Pruitt's plea deal, and if, in addition, he had prevented the prosecutor from arguing that Pruitt did not have a plea deal, Pruitt's incriminating testimony would have been significantly less convincing.

28

d.     *The weakness of defendant's alibi.*

In our previous opinion, we also reasoned that defendant's alibi testimony was weak.  (*Griffin I,* at p. 25.)  On remand, however, as we will discuss in part III.F, *post,* defendant showed that trial counsel was also ineffective in ways that undercut defendant's alibi.  For example, among other things, he failed to prepare defendant to testify, and he failed to refresh defendant's recollection with the relevant police reports.  Thus, these instances of ineffective assistance tended to reinforce the prejudicial effect of trial counsel's failure to impeach Pruitt.

3.     *Prosecutorial misconduct.*

As we held in our previous opinion, the prosecutor committed misconduct by stating falsely, in closing argument, that Pruitt did not have a plea deal.  Defendant's trial counsel, however, forfeited the misconduct by failing to object.  (*Griffin I,* at pp. 15-19.)  On remand, it became apparent that this very failure to object constituted yet another instance of ineffective assistance.  These two instances, by mutually reinforcing each other, contributed to cumulative prejudice.

D.     *Chapman.*

At trial, Chapman testified that, prior to the shooting, she "didn't know [defendant] or know his name[.]"

She admitted knowing Pruitt.  However, trial counsel did not ask her anything about her relationship with Pruitt.  Chapman then testified:

"Q.  . . .  Do you know [Pruitt] to be around that area close in time to the incident?

29

"A. Not at that moment, I didn't.

"Q. Okay. Did you learn later that he was around there?

"A. When we all came to court."

At the preliminary hearing, however, both Pruitt and Chapman had testified that they were boyfriend and girlfriend.

Chapman had also testified that, immediately after the shooting, the "word on the street" was that "Big Wack" killed the victims because they had robbed his "dope spot."

Moreover, Chapman had testified that, in the days after the shooting, Pruitt told her that he saw Big Wack shoot Morris. Pruitt also told her that "when [Morris] got shot in the front of her head, [he saw] the brains blew out from the back." Pruitt said that he saw the shooting from the porch of a vacant house.

In closing argument, the prosecutor stated: "Something that Sheila Chapman told you was that she didn't know Robert Pruitt was a witness in this case until they came to the preliminary hearing. Yet, they are consistent with each other. They didn't get together and conspire against the defendant."

He also stated: "There was no connection between these . . . individuals. Robert Pruitt and Sheila Chapman don't even know about each other until the first time they're asked to come in and testify about what they saw."

As with Pruitt, trial counsel failed to cross-examine Chapman regarding her preliminary hearing testimony. Effective cross-examination would have brought out the fact that Chapman had a romantic relationship with Pruitt; thus, she would have wanted

to support his testimony in general and to help him get a plea deal in particular. Effective cross-examination also would have highlighted the conflict between her preliminary hearing testimony that Pruitt claimed to have seen the shooting and her trial testimony that she did not even know Pruitt had been in the area until they "came to court."

Chapman's preliminary hearing testimony also tended to impeach Pruitt. Supposedly, he told Chapman that he had seen defendant shoot Morris; at trial, however, he denied this. Also, he told her that, when he saw the shooting, he was on the porch of a vacant house; at trial, however, he testified that he was sitting on the motel steps.

The trial court found that trial counsel's deficient cross-examination of Chapman was not prejudicial: "[E]ven if her motive is to lie for [Pruitt], how did she get that put together in time to do it? I've got no basis to believe that she visited Pruitt in custody. There appears to be no real way that she could understand the importance of telling a particular story as early as the prelim and even in time for trial."

However, just as the prosecutor argued that the jury should infer from Pruitt and Chapman's supposed lack of a connection that they were both telling the truth, it was fairly inferable from their actual connection that they had cooked up a story. At a minimum, effective cross-examination would have prevented the prosecutor from making this argument. It also would have shown that Chapman had been untruthful in several respects.

Most important, an adequate cross-examination of *Chapman* would have tended to impeach *Pruitt*. It would have shown that there was a widespread rumor that defendant

31

was the shooter. It would also have shown that Pruitt had given a prior inconsistent description of the shooting.

Thus, if trial counsel had conducted an adequate cross-examination of Chapman, the incriminating testimony of both Chapman and Pruitt would have been significantly less convincing.

E.    *Newell.*

At the preliminary hearing, there was evidence that defendant told Newell that he was assaulting him, *not* for snitching on defendant (Big Wack), but for snitching on defendant's younger brother (Little Wack). Defendant was joined in the assault by his mother (who was also Little Wack's mother) and by Little Wack's son.

In support of his motion for new trial, defendant introduced evidence that, in January 2004, Newell had repudiated his original statement to the police. Newell told a defense investigator that, when he was arrested, he was both drunk and high on crack cocaine. Thus, when the police interviewed him, "he was so stoned and wanted so badly to get out of custody so badly to go score more dope" that he told them falsely that defendant had confessed to the shooting.

Trial counsel never brought out the fact that Newell may have been assaulted for snitching on Little Wack. Trial counsel also never used Newell's 2004 statement to impeach Newell.

The trial court found that the failure to use the 2004 statement was ineffective assistance: "[I]t's hard to imagine . . . defense counsel having an interview where a primary accuser recants and doesn't want the jury to know that."

It concluded, however, that the ineffective assistance was not prejudicial because, although Newell had recanted, a jury would likely conclude that he had done so as a result of "getting the hell kicked out of him . . . ."

This reasoning, however, fails to take into account trial counsel's ineffective assistance in failing to introduce evidence that defendant actually assaulted Newell for snitching on Little Wack. Although defendant's statement about why he was beating Newell was hearsay, it would have been admissible under the contemporaneous statement exception. (Evid. Code, § 1241.) Moreover, because the prosecution introduced evidence that defendant said, "This is for snitching," it would have been admissible under the completeness rule (Evid. Code, § 356) to show what act of snitching defendant was referring to.

At trial, Newell merely claimed not to remember his March 2003 statement to the police. His January 2004 statement to the defense investigator went beyond this; in it, he affirmatively represented that his March 2003 statement had been false. A jury might have concluded that he recanted only because defendant had assaulted him; however, evidence that defendant had assaulted him for a different reason weakened this inference.

Most significantly, however, this evidence would have placed the assault itself in a different light. As we noted in our previous opinion (*Griffin I,* at p. 24), the very fact that

33

defendant assaulted Newell "for snitching" appeared to be an adoptive admission that Newell's March 2003 statement to the police was true. Evidence that defendant actually assaulted Newell for snitching on defendant's little brother would have attenuated this conclusion.

In our previous opinion, we also noted that: "Newell . . . was a member of defendant's gang and a good friend of defendant's younger brother; thus, he was unlikely to choose defendant as the person to inform on — especially falsely." (*Griffin I,* at p. 24.) The trial court similarly noted Newell's "lack of motive . . . to pick on Mr. Griffin . . . ." Evidence that Newell had also snitched on defendant's brother would have undercut this reasoning. Moreover, according to a police report that defendant introduced to support his motion for new trial, at one point, the police got Newell to go to defendant's Seventh Street crack house while wearing a wire. Thus, he knew the police suspected defendant.

On the present record, Newell had ample reason to inform falsely on defendant. He was charged with drug possession; he was desperate to cut a deal to avoid a three strikes sentence. More immediately, he was desperate to get out of custody so he could use crack. The word on the street was that defendant had committed the shooting. Newell also knew that the police already suspected defendant of being the shooter. His shortest route to freedom was to claim that defendant had confessed.

Thus, yet again, if trial counsel had adequately cross-examined Newell, Newell's incriminating testimony would have been significantly less convincing.

F.    *Defendant and Camarena's Alibi Evidence.*

The police interviewed both defendant and Camarena in March 2003 and again in October 2003.

Defendant testified that he was "not sure" whether he told the police about his alibi in March 2003. Likewise, in October 2003, he "may" or "may have not" told them about his alibi.

Detective Joseph, who had conducted the March 2003 interview, testified that defendant did not mention being in Orange County; to the contrary, defendant said he had been at his Seventh Street address.[10]

Camarena testified that, in March 2003, when the police interviewed him, he told them that he and defendant had been in Orange County on the night of the shooting.

Detective Joseph testified that, in March 2003, Camarena did *not* tell him about being in Orange County; "[h]e didn't provide any information relevant to the homicide[s] . . . ."

The prosecutor and trial counsel entered into the following stipulation, which was read to the jury: "[W]ere Detective Steven Shumway called to testify, he would testify that: [¶] . . . [¶] . . . When the defendant [*sic*] interviewed Alex Camarena on October

---

**10**    Actually, as shown in defendant's related petition for habeas corpus (see part II.C, *ante*), this was false; in March 2003, defendant told police he was at a party in Orange County when the shooting occurred. He added, "Gracie . . . hooked me up with her friend . . . Chaca." Proving that it is false, however, depends on evidence outside the appellate record.

the 12th of 2003, . . . Camarena[] did not give any names, telephone numbers, or addresses of any female he or the defendant may have been with on the night of the murders."**11**

Thus, in closing, the prosecutor argued: " . . . Alex tried to say yesterday that he gave the detectives names and numbers. The detectives who interviewed him said, no, he didn't."

He also argued: "[I]n October, . . . [defendant] doesn't have this alibi that he's talked about."

In his motion for new trial, however, defendant introduced a police report showing that, on October 9, 2003, he did tell police that, on the night of the murders, he was in

---

**11** The stipulation also stated:

"1. When [Detective Shumway] interviewed the defendant on October the 14th, 2003, the defendant denied knowing anybody by the name of Michael Newell;

"2. When [Detective Shumway] interviewed the defendant on October the 14th of 2003, the defendant denied knowing anyone named . . . Robert Pruitt[.]"

As defendant showed in his motion for new trial, the stipulation was false in at least two respects: (1) defendant was interviewed on October 9 and 10, not October 14, 2003; and (2) defendant denied knowing Pruitt and Newell's faces, not their names. Arguably, these discrepancies were immaterial.

The stipulation was also misleading, however, in one more serious respect. It was true that, on October 9, 2003, defendant denied knowing Pruitt or Newell; the very next day, however, on October 10, 2003, he admitted that he had lied and he actually did know them.

By omitting this fact,the stipulation was materially misleading. Thus, trial counsel should not have agreed to the wording of the stipulation. This is an additional — albeit relatively minor — instance of ineffective assistance.

Orange County with Camarena. He also told them that they were there "to hook up with Gracie's friend."

Defendant also introduced a police report showing that, on October 12, 2003, Camarena told police that, on the night of the murders, he was at "Berna's house" in Orange County, along with defendant and his girlfriend Gracie.

Thus, the stipulation was misleading, because it suggested that Camarena never told the police about defendant's alibi at all. Even worse, the stipulation was actually false, because Camarena did give the police the names "Gracie" and "Berna."

Defendant testified that, before he testified at trial, his trial counsel did not show him any police reports and did not prepare him for cross-examination.

The trial court found that trial counsel rendered ineffective assistance by failing to bring out the fact that, in October 2003, both defendant and Camarena told police about the alibi to which they both eventually testified at trial. However, it also found that the ineffective assistance was not prejudicial because, in March 2003, Camarena did not tell police they had been in Orange County, and defendant affirmatively admitted being at Seventh Street. Thus, it was irrelevant whether they offered the alibi for the first time in October 2003 or at trial; either way, it appeared that they just "put a story together . . . ."

By failing to properly prepare defendant to testify, however, trial counsel forced defendant to waffle about whether he *ever* told the police about his alibi. This hurt defendant's credibility overall. And by agreeing to the stipulation, trial counsel made it sound as if Camarena *never* told the police about defendant's alibi at *any* time before

37

trial. Moreover, the stipulation falsely suggested that, even by October 2003, Camarena could not supply details such as names; inferably, he cooked these up even later. Arguably, we might not find that these instances of ineffective assistance were prejudicial standing alone. Nevertheless, they contributed to cumulative prejudice.

G.      *Cumulative Prejudice*.

As mentioned earlier, the applicable test of prejudice is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been more favorable to the defendant. [Citation.] A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (*People v. Stanley*, *supra*, 39 Cal.4th at p. 954.)

There was no physical evidence linking defendant to the shooting. Defendant testified to an alibi. Thus, the case came down to a credibility battle. Indeed, for the prosecution, it began as an uphill battle, because Pruitt, Chapman, and Newell were all both crackheads and felons. Trial counsel's ineffective assistance gave each of these witnesses unwarranted credibility. At the same time, it diminished the credibility of his own client as well as his client's alibi witness.

Meanwhile, the prosecutor's actions reinforced trial counsel's ineffective assistance. We already held, in our previous opinion, that he committed prosecutorial misconduct by making false statements in closing argument. (*Griffin I,* at pp. 16-17, 28.) It is now apparent that he made additional statements that trial counsel could and should have shown to be false. The very fact that the prosecutor so often profited from trial

38

counsel's ineffective assistance strongly indicates that the ineffective assistance was prejudicial.

Finally, even after the jury heard evidence and argument that were skewed toward the prosecution, it deliberated for about 10 hours over three days. While this is not sufficient to show prejudice, standing alone, it does show that the jury did not consider the case to be open and shut. (See *People v. Brown* (1985) 40 Cal.3d 512, 535.)

Under these circumstances, trial counsel's ineffective assistance thoroughly undermines our confidence in the jury's verdict (except in one respect, as discussed below). At most, we have a strong suspicion that defendant is guilty. There is a reasonable probability that, absent trial counsel's unprofessional errors, a jury conscientiously applying the "beyond a reasonable doubt" standard of proof would have found defendant not guilty.

The sole exception is the guilty verdict on count 5: threatening a witness, with an enhancement for personally inflicting great bodily injury. This count was based on the beating of Newell. The credibility of Pruitt, Chapman, and Camarena was irrelevant to this count. Also, while Newell's credibility was certainly relevant, this count did not depend on his March 2003 statement to the police, which he gave to obtain leniency and later repudiated; rather, it depended on his statement to the police in July 2003, immediately after the beating. Defendant has not questioned the credibility of this latter statement. Finally, defendant admitted inflicting Newell's injuries by hitting him with a

brick and twisting his leg; he simply denied that he did so because Newell was a snitch.[12] Defendant has not suggested any way in which his trial counsel's ineffective assistance contributed to this admission. Thus, defendant's conviction on this count may stand.

## IV

## DISPOSITION

The jury's verdict on count 5 and the related enhancement is affirmed. In all other respects, the judgment is reversed. The matter is remanded for resentencing. We note, however, that the pending petition for writ of habeas corpus may potentially moot any resentencing proceedings.

The clerk of this court is directed to send a copy of this opinion to the State Bar immediately upon the issuance of the remittitur. (Bus. & Prof. Code, § 6086.7, subd. (a)(2).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI
Acting P. J.

We concur:


KING
          J.

CODRINGTON
          J.

---

[12] It did not matter whether defendant beat Newell for snitching on him or for snitching on his little brother (see part III.E, *ante*); either way, defendant's motive was to retaliate against a witness. (See Pen. Code, § 140, subd. (a).)